## TELLER v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. September 4, 1902.)

### No. 1,603.

1. GOVERNMENT PROPERTY—CONVERSION BY TRESPASSER—GOVERNMENTAL RELEASE—EFFECT.

Where railroad ties were cut from government land by a trespasser, and after the seizure of the ties by the government its agent executed a release of the ties to the trespasser on his agreement to pay for the same according to an appraisement to be subsequently made, such release transferred and vested the title to the ties in the trespasser.

2. SAME—REPLEVIN—BREACH OF CONTRACT.

Where the government, after seizing railroad ties cut by a trespasser from government land, released the ties to the trespasser on his agreement to pay for the same, the contract of release became executed, and was not broken by the government's subsequent bringing of replevin to recover the ties, so as to entitle the trespasser to defend a second action for the value of the ties, under the contract, on the ground of breach of contract or failure of consideration.

3. SAME—CUSTOM—INTENT TO PURCHASE LAND.

Where a trespasser cut railroad ties from government land, it was no defense to a subsequent action to recover the value of the ties that the trespasser had an intent to purchase the land, and that it was the custom in that community to begin the cutting of timber on government land intended to be purchased before actually entering or doing any act indicative of such intention.

4. SAME—PURCHASE OF LAND—EFFECT—RELATION.

An application to purchase government land was made by M. on January 5, 1898; he having previously contracted with defendant that, in consideration of defendant's advancing the necessary money with which to make payments, defendant should be entitled to cut from the land all timber suitable for railroad ties. The entry was duly made and between that time and June 22d following, when M. paid the purchase price for the land, and thereby became entitled to a patent, defendant cut from the land certain ties, for the value of which suit was brought. *Held*, that the payment of the price vested in M. the equitable title to the land by relation as of the date of the application, including ties cut from the land after that date.

Thayer, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Colorado.

In the fall of 1897 the plaintiff in error, John C. Teller, defendant below, was engaged in furnishing ties to the receivers of the Union Pacific Railroad Company on contract. John H. Mullison was then the claimant, and for many years in the possession, of certain placer mining grounds, consisting of 720 acres, in Carbon county, Wyo., known as the Montezuma Placer, and was desirous of obtaining the title thereof from the government. In October, 1897, it was agreed between the defendant and Mullison that defendant should furnish Mullison the money necessary to enable Mullison to enter said placer tract at the local land office, and make payment therefor at the rate of $2.50 per acre, and pay all incidental expenses, and that in consideration thereof said Mullison should allow defendant to cut and remove from said placer tract all the timber thereon suitable for railroad ties. On the 5th day of January, 1898, Mullison duly made application to the land office to enter said 720 acres, and for a patent therefor, having before that time procured the land to be surveyed agreeably to the rules of the land office, and on June 22, 1898, paid for said land at the land office, at said rate of $2.50 per acre, the sum of $1,800, and obtained the receipt of the receiver of said

117 F.—37

land office for the same. The defendant furnished Mullison said money to pay for said land; also money to pay the cost of surveying and other expenses,—in all, about $2,000. Prior to said 5th day of January, 1898, the defendant entered upon said Mullison placer tract, and made preparation for the cutting and removal of ties therefrom. But few ties were cut thereon before that date, but thereafter, and before June 22, 1898, the defendant cut upon that land about 48,974 ties. The defendant had also during the same time cut and removed from other public and unappropriated land of the United States in the vicinity of said Mullison tract a large number of railroad ties. On July 22, 1898, the United States government, through George B. Abbott, an agent of the land department, seized all of said railroad ties cut from said Mullison tract, as well as from said public, unappropriated lands, as the property of the United States; the said ties being then mostly in the Platte river, at Ft. Steele, and on its banks and in its tributaries above that place. On August 3, 1898, by the authority and express direction of the commissioner of the general land office, said George B. Abbott, as special agent of said general land office, by his instrument of writing, released to the defendant all of the said ties, and all claims of the United States thereto, in consideration of the written agreement of the defendant then made that he (the defendant) would pay the United States the full value, according to rules specifically referred to, of all such ties as belonged to the United States; the number of ties to be determined by report of said Abbott, and the question of title, and of which of said rules as to value should apply, to be determined by the general land office. Said release and agreement are printed in full in 45 C. C. A. 416, 106 Fed. 448. Afterwards, about November 1, 1898, the United States commenced an action of replevin against this defendant, in the circuit court of the United States for the district of Wyoming, to recover a portion of said railroad ties, alleging that the same had been cut by the defendant, without authority, from unsurveyed public lands; and under the writ of replevin the marshal seized 47,000 railroad ties, of which at least 44,000 were parcel of the ties aforesaid cut before August 3, 1898. The defendant answered, pleading title in himself under said release and agreement of August 3, 1898. On the trial of said action of replevin the court held that the effect of that release and agreement was to vest in the defendant the title to all of said ties which had been cut up to the date last mentioned. Conformably with such ruling, the jury returned their verdict in favor of defendant for $18,843 damages, and judgment was entered in his favor for that sum, which judgment was affirmed by this court. U. S. v. Teller, 45 C. C. A. 416, 106 Fed. 447. The petition in the present action charges that the defendant, Teller, between December 1, 1897, and September 1, 1898, entered on lands belonging to the United States in the county of Carbon, in the district of Wyoming, and, without authority or permission of plaintiff, cut timber growing thereon, from which he made 111,708 railroad ties. The petition then alleges the seizure of those ties by the agent, Abbott, July 22, 1898, and the release of the ties by Abbott upon the written agreement of the defendant, all as above stated, and that the number of the ties had been determined on the report of said Abbott, and that the value thereof to which the plaintiff was entitled, according to the rules referred to in defendant's written agreement, was $41,343.08, for which judgment was demanded. The answer of defendant, Teller, admits that on July 22, 1898, the plaintiff, through its agent, Abbott, seized 111,708 ties at and above Ft. Steele, and the release of the ties as above stated, and alleges that a part of the ties were cut on mining lands for which the government has accepted as purchase price $2.50 per acre; that others were cut under mistake of fact, and others on land which Teller intended to enter, and in accordance with a custom to cut timber on lands entered upon for such purpose, and that the general land office had never considered these matters, nor determined on what lands the ties were cut, and that not more than 39,000 ties, and of the value of 3 cents per tie, were cut on government land, and that the plaintiff, by replevying a part of the ties, had broken the contract of August 3, 1898, and defendant was no longer bound by that contract. Plaintiff's reply alleged the affirmation of said contract by the defendant by his successful defense based thereon in the action of replevin. The

Union Pacific Railroad Company was originally made a defendant in this action, but its demurrer to the complaint was sustained, and judgment of dismissal rendered in its favor, December 3, 1900, and thereafter said John C. Teller was the sole defendant. At the close of the trial the jury returned their verdict in favor of the plaintiff for the sum of $27,963.96, and judgment was entered in its favor for that sum and costs.

Willard Teller (Clayton C. Dorsey, on the brief), for plaintiff in error.

Timothy F. Burke (Earl M. Cranston, on the brief), for defendant in error.

Before SANBORN and THAYER, Circuit Judges, and LOCHREN, District Judge.

LOCHREN, District Judge, after stating the case as above, delivered the opinion of the court.

The release of the ties to the defendant by the government by its authorized agent, Abbott, in writing, August 3, 1898, and the defendant's written agreement of the same date that he would pay for such of the ties as the government was entitled to be paid for, when the number of such ties and the amounts to be paid for them should be ascertained as therein provided for, constituted, together, a valid contract, and then transferred to and vested in the defendant all the title and property right which the government then had in the ties. U. S. v. Teller, 45 C. C. A. 416, 106 Fed. 447. While this contract on the part of the defendant was wholly executory, and to be performed in the then future, on the part of the government, it was wholly executed and performed on the delivery of the written release, so far as vesting in the defendant the government's title to the ties was concerned. About that matter the government did not stipulate that it would do or refrain from doing anything further. There was not, therefore, and could not be, any breach of the contract in respect to this matter, as to which the contract had been fully and irrevocably performed. The subsequent action of replevin may have been wrongful and baseless, but it was no breach of the contract, and was in fact defeated by that contract, and the property rights which it had vested in the defendant. As the defendant in that action, because of his title derived through that contract, recovered judgment against the government for the value of the ties replevied, there was no failure of consideration, to excuse nonperformance of the contract on his part.

Some of the rulings respecting which error is assigned may be disposed of very briefly. The record discloses nothing improper in the rulings of the court in fixing the time for the trial of the cause, and denying the defendant's application for a continuance, and no prejudice to the defendant appears to have resulted from either.

The testimony of Mullison, who acted as defendant's superintendent, respecting reports of foremen as to the number of ties cut at different places, was harmless, in view of the admissions in the case, and testimony of other witnesses, including the defendant.

It seems needless to say that no proof of a custom to cut and remove timber from public lands will shield a trespasser, and that

no proof of mere intention to subsequently purchase a tract of such land, without any act done towards acquiring the title, could give any color of excuse for appropriating the timber growing on such tract. "The absolute title to these lands being at the time in the United States, it had, as owner, the same right and dominion over them as any owner would have. No one had the right to enter upon the lands, no one had the right to cut a stick thereon, without its consent. Any one so going upon the lands and cutting timber would be guilty of the commission of an act of trespass." Railroad Co. v. Lewis, 162 U. S. 366, 376, 16 Sup. Ct. 831, 834, 40 L. Ed. 1002.

Other assignments of error are based on the court's charge to the jury to the effect that the defendant was liable for the value of the ties cut from the Mullison placer tract. The court charged the jury that:

"Mr. Mullison had no right to sell the timber not necessarily taken down in the ordinary working of the placer claim as a placer mine, and the defendant had no right to purchase it from him until a patent issued to him for the land."

And in other portions of the charge, to all of which exceptions were duly taken, the court gave the jury the same directions, in substance. Upon these exceptions to these parts of the court's charge arises the only serious question in this case.

In Teller v. U. S., 51 C. C. A. 230, 113 Fed. 273, it was held, and very clearly demonstrated, that this defendant was properly convicted of a misdemeanor, under Rev. St. 1878, § 2461, for cutting and removing these very ties from this Mullison placer tract, between January 5, 1898, when Mullison filed in the local land office his application for a patent for that tract on payment of $2.50 per acre therefor, and June 22, 1898, when he actually made full payment for the land, and obtained the receiver's certificate receipt entitling him to a patent therefor. During this interim when the ties were cut and removed, Mullison was in lawful possession of the placer tract, with an option contract with the government, permitting him to purchase the tract with the timber and whatever else was parcel of the tract on January 5, 1898, upon payment of the designated purchase price within the proper time. But until such purchase was completed by payment of the purchase price, the land continued to be part of the public lands of the United States, and only segregated from other public lands to the extent that Mullison's option right to acquire the title would, while it existed, prevent entry or valid claim from being initiated by any other person, but did not vest in Mullison any dominion over the land in excess of what he had by his location and working of the tract as a mining claim. He was, before making payment for the land, amenable for any waste or spoliation of the timber, and could grant no valid license to the defendant to cut the timber. Defendant was therefore guilty of criminal misdemeanor, and his guilty act was complete when he cut and removed the ties; and no change in the title to the land or the timber or ties by any act subsequent to the cutting and removal of the ties, when all title, legal and equitable, was in the government, could condone or wipe out the guilt of the completed misdemeanor, although a

subsequent change in the title might devest the government of its right to seize and recover the ties so cut. In this case the release and transfer of the ties to the defendant by the government through its agent, Abbott, after the commission of the misdemeanor, was not even suggested as any defense to the prosecution for that misdemeanor, though it was adjudged to be an ample defense to the government's action of replevin for the ties. Upon the payment for the land by Mullison on June 22, 1898, when he obtained the receiver's certificate receipt entitling him to a patent for the land, Mullison became the equitable owner of the land in fee, with the absolute, unrestricted right to use and exercise dominion over it; and the holding by the government of the naked title till its patent to Mullison could issue was a holding in trust for Mullison. This court so held in the case of Teller v. U. S., 51 C. C. A. 236, 113 Fed. 279, as follows:

"It may be conceded that the payment for the land conferred upon Mullison an equitable title to the same, which entitled him to a patent, and that he was not required to wait for the actual issue of a patent, converting the equitable right into a legal title, before exercising all the incidents of ownership. We think this is the law as established by the authorities. Witherspoon v. Duncan, 4 Wall. 210, 18 L. Ed. 839; Stark v. Starrs, 6 Wall. 402, 417, 18 L. Ed. 925; Deffeback v. Hawke, 115 U. S. 392, 405, 6 Sup. Ct. 95, 29 L. Ed. 423; Cornelius v. Kessel, 128 U. S. 456, 460, 9 Sup. Ct. 122, 32 L. Ed. 482; Railroad Co. v. Whitney, 132 U. S. 357, 361, 10 Sup. Ct. 112, 33 L. Ed. 363; Benson Mining & Smelting Co. v. Alta Mining & Smelting Co., 145 U. S. 428, 12 Sup. Ct. 877, 36 L. Ed. 762; Bardon v. Railroad Co., 145 U. S. 535, 12 Sup. Ct. 856, 36 L. Ed. 806; Bogan v. Mortgage Co., 11 C. C. A. 128, 63 Fed. 192. And the contention of the government in this case to the contrary is not well founded. The foregoing cases are, however, no authority for the proposition that lands cease to be public lands, or that a claimant secures an equitable right to a patent, until all the acts are performed and all the money is paid by the claimant, which are made by the law' prerequisite to securing the legal title."

As stated, the application of Mullison to enter the land, and receive a patent therefor on payment of $2.50 per acre, when accepted at the land office, January 5, 1898, constituted a contract on the part of the government to sell him the land as it then was,—standing timber included,—and convey him the same by patent on the payment by him of that price within the proper time. To his previous possessory right as mining claimant was then added his right as purchaser. This gave him no right, before full payment, to commit waste or lessen the value of the land while it still belonged to the government, by denuding it of its timber. But when he made full payment, June 22, 1898, and obtained the receiver's certificate voucher for such payment, he became the equitable and potential owner of the land, and of everything that was parcel of it on January 5, 1898, when the contract of purchase was made. His title, when completed by payment, took effect, under the equitable doctrine of relation, from the date of his contract of purchase; and he could have maintained an action of trover for any timber removed from the land by a stranger between the time of the making of the contract and obtaining the title. Heath v. Ross, 12 Johns. 140. "Where there are divers acts concurrent to make a conveyance, estate, or other thing, the original act shall be preferred; and to this the other act shall

have relation. Vin. Abr. tit. 'Relation,' 290; Harper v. Bailiffs of Derby, Jones, W., 425. This principle has been repeatedly recognized. In Jackson v. Bull, 1 Johns. Cas. 81, it was held 'that a deed executed in pursuance of a previous contract for the same premises is good, by relation, from the time of making the contract, so as to render valid every intermediate sale or disposition of the land by the grantees.' Jackson v. Raymond, Id. 85, note; Case v. De Goes, 3 Caines, 262, per Thompson, J.; Jackson v. Bard, 4 Johns. 234, 4 Am. Dec. 267." Jackson v. McCall, 3 Cow. 80.

In U. S. v. Ball (C. C.) 31 Fed. 667, one Green entered a tract under the homestead act in November, 1880, and paid the fees. He made final proof in January, 1886, and received his final certificate, entitling him to a patent. In the meantime, while he was holding the land under the act, and before making final proof, he had cut from the land and sold to defendants, who had knowledge of the facts, 239,680 feet of logs; and the government brought suit to recover the value of the logs. Held, that it could not maintain the action, because when a vendee has fully completed his contract of purchase, and becomes entitled to a deed of the land, he is no longer liable for any waste which he has previously committed thereon. The court added:

"But it has been suggested that the defendants having received this timber from the settler and converted it to their own use while the contract of purchase was only partly performed, and the land belonged to the United States, they are liable therefor. Under the circumstances, they certainly took the chances of Green's complying with the law and obtaining the certificate. But if the performance of his contract and the issue of the final certificate relieves Green from liability for cutting and removing this timber when and as he did, it ought to prevent the United States from maintaining an action against his vendees for converting it to their use. Before the timber was cut, the United States had disposed of the land to Green, and afterwards acknowledged the performance of the conditions of sale. The plaintiff has had pay for the timber once, and has no right to claim it again from these defendants. If A. takes B.'s horse and sells him to C., but afterwards pays B. for it, the latter cannot then maintain an action against C. to recover the horse or its increase. The effect of the whole transaction between Green and the United States is to establish the title of the former to the land, and the timber thereon, from the date of the entry in the land office, and all those who claim under him for either the land or timber are entitled to stand in his shoes."

In U. S. v. Freyberg (C. C.) 32 Fed. 195, one Klingenberg in November, 1883, entered the land as a homestead, and lived on the same thereafter. By his consent, and for a price paid to him, the defendants in 1884 and 1885 cut and removed from the land 210,668 feet of pine timber. The cutting was not to improve the land, but for sale of the timber. The action was commenced by the United States to recover the value of the timber. Afterwards, on January 15, 1886, Klingenberg commuted his homestead entry, and paid for the land at 1.25 per acre, and obtained the receiver's receipt therefor. The proofs were forwarded to the department, but the patent had not yet issued. Upon these facts the court held that the United States could not recover. The court said:

"The consummation of the purchase, and the payment of the purchase money in full, must be held to relate back to the original entry, and con-

sequently to protect the occupant and purchaser from liability for acts done on the land while he was holding under his homestead entry. And the protection resulting to him, of course, inures to the benefit of his vendees. No other conclusion seems consonant with justice. As suggested on the argument, the case is quite analogous in principle to that of a purchase of land by one person from another under contract. In violation of the contract, the purchaser, being in possession, commits waste. But when the purchase money is due he pays it in full, and becomes entitled to a deed. Could the vendor in such case, after receiving and retaining the purchase money, recover for the waste committed while the contract was yet unperformed? Or could he, after parting with his entire interest in the land by accepting payment, yet maintain a suit previously begun, and recover damages therein for such waste? If not, it is difficult to see how the government is entitled to recover in the case at bar."

Defendant's purchase of the timber from Mullison, and payment for it to enable Mullison to perform his contract with the government and obtain title to the land, was lawful and unobjectionable, had he allowed the timber to stand until Mullison had so obtained the title. He violated the law by cutting the timber before Mullison got title, and while the land was still public land, and he has been punished for that violation. His title to the ties cut on this Mullison placer tract is in no way based upon his unlawful trespass, but rests entirely on the sale and transfer by the United States to Mullison of the land and the timber which was on it January 5, 1898, which sale and transfer was consummated by payment after the ties were cut, whereby the government can no longer assert title to that timber, nor question any disposition made of it by Mullison at any time. It follows that the defendant, and not the government, was the owner of those ties when this action was begun, and at all times since June 22, 1898, when Mullison became the owner of that placer tract. The court therefore erred in its instruction to the jury that the plaintiff was entitled to recover for those ties, and for this error the judgment is reversed, and a new trial granted.

THAYER, Circuit Judge (dissenting). The majority of the court entertain the view, it seems, that the judgment below must be reversed because the trial judge, in one paragraph of his general charge, remarked that "Mr. Mullison had no right to sell the timber not necessarily taken down in the ordinary working of his placer claim as a placer mine, and the defendant had no right to purchase it from him, until a patent issued to him for the land." I am not able to concur in this view of the case, for the following reasons:

In the first place, no sufficient exception was taken to the above excerpt from the charge to bring the question involved before us for review, if we adhere to the rule, which has frequently been announced by this court, that exceptions to a charge, to be of any avail upon appeal, must be specific, and point out with certainty the particular part thereof which is supposed to be faulty, and that a general exception to a long paragraph of the charge, a part of which is unobjectionable, will not suffice. Price v. Pankhurst, 3 C. C. A. 551, 53 Fed. 312; Philip Schneider Brewing Co. v. American Ice Mach. Co., 23 C. C. A. 89, 98, 77 Fed. 138; Railway Co. v. Johnson, 4 C. C. A. 447, 54 Fed. 474; Railway Co. v. Spencer, 18

C. C. A. 114, 71 Fed. 93; Railway Co. v. Jurey, 111 U. S. 584, 4 Sup. Ct. 566, 28 L. Ed. 527. In the present instance, counsel for the plaintiff in error took a general exception to a long paragraph of the charge, which covers more than two pages of the printed record, a part of which is unobjectionable. In this paragraph the short excerpt above quoted is found, but the court's attention does not appear to have been called to the particular clause which is now adjudged to be erroneous. I think we might well hold, and ought to hold, that the question on which the decision of the majority of the court is made to turn was not raised below in any such form as to bring it before this court for consideration and decision.

In the second place, I very much doubt whether the plaintiff in error pleaded as a defense, with respect to the ties cut on the Mullison claim, that he was not obligated to pay for them, because after the trespass was committed the government accepted payment for the land on which it had been committed, and thereby estopped itself from demanding payment for the ties. It is certain that no such defense was pleaded in a clear and concise form, as it should have been if the accused intended to rely upon it as a defense. The government, as I construe its complaint, sued upon the agreement signed by Teller, when the ties were released by the government, to the effect that, if released, he would pay for them according to the rule of valuation theretofore prescribed by the commissioner of the general land office, and that the government should have the right to determine, as respects all of the ties, including those cut and removed from the Mullison claim, whether a trespass had been committed in cutting them, and whether Teller should be compelled to pay for them. On the other hand, the defenses pleaded by the plaintiff in error appear to have been—First, that he had been released from his obligation to pay for any of the ties, as he had agreed to do, by the action of the government in replevying them after they were released; and, second, that, if he was not released by such wrongful conduct on the part of the government, he was at least entitled to set off against the value of the ties cut on the Mullison claim the sum of $1,800 which he had advanced to Mullison subsequent to the trespass to pay for that claim. A set-off to the amount last stated was distinctly pleaded in the amended answer. As I view the case, therefore, the defense now insisted upon, that the government cannot recover the value of the ties cut on the Mullison claim because it accepted payment for the land at the rate of $2.50 per acre some months after the timber thereon was unlawfully cut and removed, was not made in the answer, or at least it was not made in such a clear and concise form as to enable the plaintiff in error to avail himself of that defense. For this reason the paragraph of the charge which is criticised and held to constitute a reversible error did no harm, and in my opinion the judgment below ought not to be reversed on account thereof.

By what has thus far been said, I would not be understood as conceding that the charge of the lower court would have been erroneous even if the question to which it relates had been properly raised by the pleadings, and even if an exception had been preserved in due form. In the case of Teller v. U. S., 51 C. C. A. 230, 113 Fed. 273,

which was a criminal proceeding against Teller for unlawfully cutting and removing the very timber now in controversy, this court, after a very full and careful consideration of all the circumstances attending the trespass, held that Teller was guilty of a criminal offense in cutting and removing timber from the Mullison claim before the land was paid for and the United States was devested of its title, as well as for cutting timber on other lands described in the information, to which he had no shadow of a claim, and a conviction for the offense was sustained. We held, in substance, in that case (51 C. C. A. 230, 113 Fed. 279–282), that, at the time the timber in question was cut on the Mullison claim, Mullison, not having made any payments for the land, and being entitled to relinquish it at his mere pleasure, had a possessory title only, and that while such possessory title segregated the land from the public domain, so as to protect him from rival claimants, yet it gave him nothing but the right to occupy the claim for mining purposes; that it did not give him a complete equitable title, nor entitle him to cut timber thereon except for ordinary mining purposes, nor devest the United States of its legal title, "or impair its right to protect the land and its product, by either civil or criminal proceedings, from trespass or waste." I still adhere to these views, and believe them to be sound, notwithstanding the doctrine of relation which has been invoked to arrive at the result that a person may be punished criminally for unlawfully cutting and removing timber from public land, but cannot be made to pay for the timber so unlawfully converted, if, perchance, some months after the trespass is committed, the government accepts payment for the land under an entry which happened to be made previous to the trespass. In the present case the testimony shows, I think, that a considerable quantity of the ties in controversy were cut on the Mullison claim in November, 1897, before the land was even entered for purchase; but in any event, as the act of cutting was unlawful, and as the trees, when cut, ceased to be realty, and became at once the personal property of the United States (Schulenberg v. Harriman, 21 Wall. 44, 64, 22 L. Ed. 551; Wooden Ware Co. v. U. S., 106 U. S. 432, 1 Sup. Ct. 398, 27 L. Ed. 230; Railroad Co. v. Lewis, 162 U. S. 366, 374, 16 Sup. Ct. 831, 40 L. Ed. 1002), I am unwilling to concede that its subsequent acceptance of payment for the land destroyed its right of property in the ties, which had long previously ceased to be a part of the realty. Moreover, as one who enters land for purchase is under no obligation to complete the purchase, but may abandon his entry at any moment, and cannot be proceeded against as upon an executory contract to buy, I think it is a vicious doctrine which denies to the government the right, if it is so disposed, to recover the value of the timber which one unlawfully cuts and removes, while he has not even a complete equitable title, merely because he eventually concludes to complete his purchase, and does so.

For these reasons, somewhat hastily expressed, I think that the judgment below ought to be affirmed, instead of reversed.